HOMES & LAND AFFILIATES, LLC,
        Plaintiff,

-vs-                                    Case No.  6:07-cv-1051-Orl-28DAB

HOMES & LOANS MAGAZINE, LLC,
ROBERT KLEZMER, MARYANNE
KLEZMER, WILLIAM KEELER, BONNIE
KEELER,
            Defendants.
_____

# ORDER

Plaintiff, Homes & Land Affiliates, LLC, has filed a four-count Complaint, alleging (1) trademark infringement in violation of 15 U.S.C. § 1117, part of the Lanham Act; (2) service mark infringement in violation of 15 U.S.C. § 1117; (3) unfair competition in violation of 15 U.S.C. § 1125(a); and (4) common law unfair competition.  (Compl., Doc. 1).  Defendants, Homes & Loans Magazine, LLC, Robert Klezmer, and William Keeler, have filed a six-count Amended Counterclaim.[1]  Defendants request declarations of non-infringement of Plaintiff's trademarks and service mark, and they allege (1) common law unfair competition, (2) breach of contract, (3) promissory estoppel, (4) and copyright infringement.  Plaintiff now moves for summary judgment.  (Doc. 38).[2]  Defendants have filed their response in opposition.  (Doc.

_____

[1]By its September 12, 2007 Order (Doc. 12), the Court dismissed the case against Maryanne Klezmer and Bonnie Keeler without prejudice.

[2]Though Plaintiff styles its motion as one seeking partial summary judgment, Plaintiff seeks summary judgment on all claims and counterclaims.  Plaintiff contends that the only issues to remain for a jury's decision would be compensatory damages, enhanced damages, and the question of whether Plaintiff infringed upon Defendants' copyright.  (Doc. 38 at 26).

43).

<u>I.  Background and Procedural History</u>

Plaintiff is a publisher of real estate marketing magazines under the registered trademark name HOMES & LAND®,[3] delivering its product via a network of franchisees operating throughout the United States and Canada.  Plaintiff and its franchisees sell advertisements in the *Homes & Land* magazine to real estate professionals seeking to market their real estate listings.  Plaintiff and its franchisees then place the *Homes & Land* magazine in display racks at restaurants, grocery stores, convenience stores, and real estate offices where the magazine is available to the public free of charge.  Plaintiff first used its trademarked name in interstate commerce in April 1973 and has used the mark continuously since. (Ex. A to Compl.).  Additionally, Plaintiff first used its trademarked design in interstate commerce in April 1992.  (Ex. B to Compl.).  In March 2001, Plaintiff expanded its product offering and began using the service mark HOMESANDLAND.COM[4] to provide similar services on the Internet.

Defendants began conducting business under the name Homes & Loans Magazine in early 2005.[5]  Defendants registered the domain name HOMESANDLOANSMAG.COM on

---

[3]Plaintiff owns the following registered trademarks: (1) U.S. Registration No. 1,258,835—the trademarked name HOMES & LAND, (Ex. A to Compl.), and (2)U.S. Registration No. 1,756,790—the trademarked masthead design for HOMES & LAND featuring block lettering and the use of an ampersand, (Ex. B to Compl.).

[4]In addition to its registered trademarks, Plaintiff also owns U.S. Registration No. 2,743,516—the service mark for HOMESANDLAND.COM—which was first registered on July 29, 2003.  (Ex. C to Compl.).

[5]Defendants own the registered trademark for HOMES & LOANS MAGAZINE, U.S.

January 6, 2005 before forming Homes & Loans Magazine, LLC—a Florida limited liability company—on February 18, 2005.  Defendants published their first issue of *Homes & Loans Magazine* in Texas in June 2005.[6]  Defendants' magazines contain real estate listings, realtors' and mortgage brokers' contact information, and advertisements for these professionals.  Defendants distribute their magazines in much the same manner as Plaintiff, using a series of display racks at restaurants, grocery stores, and convenience stores where the magazines are distributed to the public free of charge.   Defendants continued to expand Homes & Loans Magazine, LLC until its peak in 2007 with eleven magazines in New York, Texas, Florida, North Carolina, and South Carolina and a license sold for a future publication in Georgia.

In a letter dated June 21, 2005, counsel for Plaintiff informed Defendants that they were infringing upon Plaintiff's marks and requested that Defendants take steps to correct their infringing activities, including modifying their business name and design.  (Ex. F to Compl.).  After the allegedly infringing behavior continued, Plaintiff sent a second letter on August 2, 2005 threatening litigation if Defendants did not respond by August 5, 2005.  (Ex. G to Compl.).  After receipt of this second letter, Defendants changed their masthead design.

---

Registration No. 3,250,251.  After no opposition was made to its registration, Defendants were given this registration number on June 12, 2007.

[6]However, prior to forming the Florida LLC but after the registration of its name, Defendants permitted the use of their intended trade name for the publication in New York of a magazine advertising real estate, loans, and related services.  A *Homes and Loans Magazine* was published in Suffolk County, New York beginning in February 2005, and another in Nassua County, New York, beginning in April 2005; the publishers later became licensees of Defendants.

After reviewing the altered design, Plaintiff responded with a letter indicating that the new design was acceptable but reserving the right to reopen discussions should actual confusion occur. (Ex. I to Compl.). After discovering acts of continuing actual confusion, Plaintiff filed the instant suit.

## II. Standard for Summary Judgment

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). "A nonmoving party, opposing a motion for summary judgment supported by affidavits [or other relevant evidence] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e)(2) (providing that the nonmovant "must . . . set out specific facts showing a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the

-4-

matter but to determine whether there is a genuine issue for trial." Id. at 249. Some degree of factual dispute is expected, but to defeat a motion for summary judgment the factual dispute must be material and genuine. That is, the factual evidence must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

## III. Analysis

A. Trademark Infringement, Service Mark Infringement, and Unfair Competition[7]

Plaintiff contends that Defendants infringed upon its marks when Defendants published a magazine and used promotional materials that "were produced with block lettering and an ampersand strikingly similar to the masthead logo used on [Plaintiff's] magazines," thereby resulting in actual confusion over the marks. (Doc. 38 at 2). Plaintiff argues that no genuine issue of fact exists as to whether Defendants infringe upon Plaintiff's marks. (Doc 38 at 6).

"Trademarks are 'any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish [one's] goods . . . from those manufactured or sold by others and to indicate the source of the goods.'" Leigh v. Warner Bros., Inc., 212 F.3d 1210,

---

[7]Count III of Plaintiff's Complaint asserts a claim for unfair competition in violation of 15 U.S.C. § 1125(a). The Court addresses Plaintiffs claim for unfair competition under the same analysis as used for the trademark infringement claim because "the same facts support a cause of action for unfair competition as for trademark infringement; if there is no genuine issue of fact as to trademark infringement, there is none as to unfair competition, either." Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1475 n.3 (11th Cir. 1991). Additionally, the Court applies the same analysis to Plaintiff's claims of unfair competition under Florida common law as it does to Plaintiff's claim of trademark infringement under the Lanham Act. See Am. United Life Ins. Co. v. Am. United Ins., 731 F. Supp 480, 486 (S.D. Fla. 1990).

1216 (11th Cir. 2000) (quoting 15 U.S.C. § 1127) (alterations in original). "Service marks" are words or names used "to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services." 15 U.S.C. § 1127. Established trademarks and service marks are entitled to protection from infringement under both federal and state law.

"Under the Lanham Act, 15 U.S.C. § 1114(1), a defendant is liable for infringement, if, without consent, he uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark' which 'is likely to cause confusion, or to cause mistake, or to deceive.'" <u>Frehling Enters. v. Int'l Select Group, Inc.</u>, 192 F.3d 1330,1335 (11th Cir. 1999). In order to prevail on a claim of infringement, a plaintiff must show "that its mark is valid and . . . that the defendant's use of the contested mark is likely to cause confusion." <u>Dieter v. B & H Indus. of Sw. Fla., Inc.</u>, 880 F.2d 322, 326 (11th Cir. 1989). The validity of Plaintiff's trademarks is not disputed in the present lawsuit,[8] leaving for the Court's consideration the issue of whether Defendants' use of their mark is likely to confuse consumers.

A determination of likelihood of confusion requires analysis of seven factors: "(1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff

─────────────────────

[8]Registration of a mark creates a rebuttable presumption of the mark's validity and the holder's right to its exclusive use. 15 U.S.C. § 1057(b). As previously discussed, Plaintiff has registered both trademarks and its service mark. Additionally, Plaintiff's trademarks have attained incontestable status under 15 U.S.C § 1065, preventing any challenges to their validity. <u>See</u> <u>Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.</u>, 469 U.S. 189, 201 (1985). Plaintiff's service mark, however, has not achieved incontestable status and therefore would not enjoy this same protection from challenge.

and defendant; (4) the similarity of the sales methods; (5) the similarity of advertising methods; (6) the defendant's intent, e.g., does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) actual confusion." Alliance Metals, Inc., of Atlanta v. Hinely Indus., Inc., 222 F.3d 895, 907 (11th Cir. 2000). Of these factors, the most important in this circuit are the mark's strength and evidence of actual confusion. Id. "The court does not have to consider all of these factors in every case and in some cases, 'new' factors may merit consideration." Swatch Watch, S.A. v. Taxor, Inc., 785 F.2d 956, 958 (11th Cir. 1986).

### 1.  Strength of Mark

The strength of a mark dictates the level of protection it receives. See John H. Harland Co. v. Clarke Checks, Inc., 711 F.2d 966, 973 (11th Cir. 1983). "'[T]he strength and distinctiveness of plaintiff's mark is a vital consideration in determining the scope of protection it should be accorded.  Strong marks are widely protected, as contrasted to weak marks.'" Id. (quoting Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 259 (5th Cir. 1980)).  In determining the strength of a mark, the Court weighs three factors: (1) the distinctiveness of the mark; (2) whether the mark has been declared as "incontestable" under 15 U.S.C. § 1065(3); and (3) the extent of third-party use of the mark.  See Ocean Bio-Chem, Inc. v. Turner Network Television, Inc., 741 F. Supp. 1546, 1554 (S.D. Fla. 1990).

"The distinctiveness of a mark has been characterized as 'its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source.'" Frehling Enters., 192 F.3d at 1335 (quoting McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126, 1131 (2d Cir.1979)).  "There are four categories of marks:  (1) generic, (2)

descriptive, (3) suggestive, and (4) arbitrary. The categories are based on the relationship between the name and the service or good it describes." Id. at 1335 (citation omitted). Generic marks "refer to a class of which the individual service is a member" and receive the least protection. Id. "Generic terms may never be registered as trademarks under the Lanham Act." Dieter, 880 F.2d at 328. In contrast, arbitrary marks are "word[s] or phrase[s] that bear[] no relationship to the product" and receive the most protection. Frehling, 192 F.3d at 1335-36. Between the two ends of this spectrum lie descriptive and suggestive marks. Suggestive marks refer to a characteristic of the product but require a leap of the imagination to get from the mark to the product. AmBrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1537 n.20 (11th Cir. 1986). Descriptive marks, on the other hand, "identify a characteristic or quality of an article or service" and receive less protection than suggestive marks do. Dieter, 880 F.2d at 327 (quoting Vision Ctr. v. Opticks, Inc., 596 F.2d 111, 115 (5th Cir. 1979)).

When determining whether a particular mark is suggestive or descriptive, courts have used the "imagination test" and the "competitor use" test. Gulf Coast Commercial Corp. v. Gordon River Hotel Assocs., Case No. 2:05-564-FtM-33SPC, 2006 WL 1382072, at *4 (M.D. Fla. May 18, 2006). The "imagination test" asks whether a "'customer who observes the term can readily perceive the nature of plaintiff's services, without having to exercise his imagination.'" Id. (quoting Investacorp, Inc. v. Arabian Inv. Banking Corp., 931 F.2d 1519, 1524 (11th Cir. 1991)). If no imagination is needed, the term is considered merely descriptive. Id. The "competitor use" test asks "whether competitors would be likely to need the terms used in the trademark in describing their products." Vision Ctr., 596 F.2d at 116

(citation and internal quotation omitted).

Plaintiff sells advertising space in its magazines to real estate professionals under the trademarked name "HOMES & LAND" and the service mark "HOMESANDLAND.COM." The "Homes & Land" marks describe a characteristic or quality of the product or service offered. It takes no exercise of imagination to readily perceive that Plaintiff services the real estate industry and its associated businesses. The terms "homes" and "land" are descriptive of the products or services being offered by Plaintiff and are terms likely needed to describe a competitor's product. Under this analysis, the trademark "HOMES & LAND" and the service mark "HOMESANDLAND.COM" would be classified as a descriptive marks, generally considered weak and deserving of a narrow range of protection. Carnival Corp. v. SeaEscape Casino Cruises, Inc., 74 F. Supp. 2d 1261, 1265 (S.D. Fla. 1999).

Plaintiff, however, argues that its longtime use of the marks, significant advertising expenditures, and large volume of sales have strengthened the marks. (Doc. 38 at 7). Despite the weakness generally associated with descriptive marks, such marks may acquire strength through the promotional efforts of their owner. See John H. Harland Co., 711 F.2d at 975 n.13; see also Standard Int'l Corp. v. Am. Sponge & Chamois Co., Inc., 394 F.2d 599, 600 (C.C.P.A. 1968) ("[A] mark which is initially a weak one may, by reason of subsequent use and promotion, acquire such distinctiveness that it can function as a significant indication of a particular producer as source of the goods with which it is used."). Plaintiff has used the trademark "HOMES & LAND" in commerce continuously since April 1973, has used its trademarked design continuously since April 1992, and has used the service mark "HOMESANDLAND.COM" continuously since July 2003. (Ex. 1 to Doc. 38). Additionally,

Plaintiff annually publishes millions of magazines bearing its marks and spent approximately $1.27 million in promotions and advertising in 2005 alone. (Id.). Even Defendant William Keeler admits the success of Plaintiff's promotional activities by stating that "everyone knows who they are" and agreeing with Plaintiff's assertion that the HOMES & LAND mark enjoys widespread recognition across the United States. (Ex. 7 to Doc. 38). The Court finds that Plaintiff's promotional efforts have strengthened its otherwise weak marks.

Additionally, Plaintiff argues in support of the strength of its trademarks that both of the trademarks[9] have achieved "incontestable" status under 15 U.S.C. § 1065.[10] (Doc. 38 at 7-8). Plaintiff asserts that the trademarks' incontestable status means that the Court is to consider the trademarks strong marks for the purpose of the likelihood of confusion analysis.[11] (Id. at 8). Indeed, under Eleventh Circuit precedent, a trademark's incontestable

---

[9]Plaintiff contends that its trademarks relating to the *Homes & Land* magazine are incontestable. (Doc. 38 at 3, 6-7). Plaintiff, however, makes no assertion that the HOMESANDLAND.COM service mark enjoys a similar incontestable status.

[10]In its motion for summary judgment, Plaintiff states that two of its trademarks are incontestable on the "virtue of their long-term and continuous use." (Doc. 38 at 6-7). Plaintiff's statement implies that a mark may achieve incontestable status on the basis of continued, long-term use alone. Instead, to achieve incontestable status, Plaintiff must file an affidavit with the U.S. Patent and Trademark Office five years after registering the trademark and have the mark declared "incontestable." 15 U.S.C. § 1065(3). Other than an affidavit stating that two of the marks enjoy incontestable status, (Ex. 1 to Doc. 38, ¶¶ 5-6), Plaintiff has provided the Court no proof of filing the required affidavit. However, Defendants appear to concede the incontestable status of Plaintiff's trademarks by stating "[t]he weakness of Plaintiff's marks is not altered by the fact that certain of the marks have achieved incontestable status." (Doc. 43 at 14).

[11]Additionally, Plaintiff asserts that it need not prove secondary meaning of the marks. (Doc. 38 at 8). Plaintiff is correct. See Dieter, 880 F.2d at 328 (explaining that once a mark has been declared incontestable, the mark "cannot be challenged on the grounds that it is merely descriptive"). However, proof of secondary meaning goes to the validity of the

status is taken into account in the likelihood-of-confusion analysis.[12]  See Dieter, 880 F.2d at 329.  An incontestable mark is "presumed to be at least descriptive with secondary meaning and thus a relatively strong mark."  Id.  The incontestable status of Plaintiff's trademarks provides weight to Plaintiff's argument that its trademarks are strong.  However, since the service mark "HOMESANDLAND.COM" has not achieved incontestable status, it does not receive this presumption of strength enjoyed by the incontestable trademarks.

In addition to a mark's distinctiveness and incontestable status, courts must also examine third-party use when gauging the strength of a mark.  See Sun Banks v. Sun Fed. Sav. & Loan Ass'n, 651 F.2d 311, 315 (5th Cir. 1981).  "Extensive third party use of the mark or a term used in the trademark weakens the strength of the mark."  HBP, Inc. v. Am. Marine Holdings, Inc., 290 F. Supp. 2d 1320, 1329 (M.D. Fla. 2003).  Defendants argue that extensive third-party use of "Homes" in real-estate listing magazines significantly weakens Plaintiff's trademarks.  (Doc. 43 at 14-15).  Defendants have provided the Court with

———————————————

trademark—an issue not in dispute here.

[12]In Dieter, however, the Eleventh Circuit took a minority position regarding the effect of a mark's incontestable status on the strength of the mark factor in the likelihood-of-confusion analysis.  Other circuits conclude that an otherwise weak mark is not made strong for the purposes of the likelihood-of-confusion analysis because of its incontestable status.  See Oreck Corp. v. U.S. Floor Sys., Inc., 803 F.2d 166, 171 (5th Cir. 1987) ("Incontestable status does not make a weak mark strong."); see also Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., 43 F.3d 922, 935 (4th Cir. 1995) (stating that "incontestability affects the validity of the trademark but does not establish the likelihood of confusion necessary to warrant protection from infringement"); Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1077-78 (2d Cir. 1993) (implying that the marketplace strength of an incontestable mark may be challenged); Munters Corp. v. Matsui Am., Inc., 909 F.2d 250, 252 (7th Cir. 1990) (incontestable status does not preclude consideration of a mark's strength).

evidence of eighteen publications using "Homes" in their titles and numerous websites using some combination of the words "homes" and "land." (Sullivan Decl., Tab 2 to Doc. 43, Exs. 1-34). This evidence clearly establishes widespread third-party use of the word "Homes" in real estate listing magazines and websites, weighing against the strength of the "HOMES & LAND" trademark and the "HOMESANDLAND.COM" service mark.

The Court must examine these factors when determining the strength of the marks. The facts that the "HOMES & LAND" trademarks have been extensively promoted, enjoy widespread notoriety throughout the United States, and have been declared incontestable give the "HOMES & LAND" mark some strength. However, these factors must be viewed against the descriptive nature of the marks and the extensive third-party use, both of which weaken the mark. The Court finds Plaintiff's service mark to be weak. Additionally, the Court does not find that Plaintiff's trademarks are particularly strong, but this does not mean that no likelihood of confusion exists. The Court must examine the remaining factors in order to determine whether such likelihood of confusion exists.

2. Similarity of Marks

The similarity of the marks is "'determined by considering the overall impression created by the mark[s] as a whole rather than simply comparing individual features of the marks.'" John H. Harland Co., 711 F.2d at 975 (quoting Exxon Corp. v. Tex. Motor Exch., Inc., 628 F.2d 500, 504-05 (5th Cir. 1980)). To determine the similarity of the marks, "the court compares the marks and considers the overall impressions that the marks create, including the sound, appearance, and manner in which they are used." Frehling, 192 F.3d at 1337. "[L]ikelihood of confusion cannot be predicated on dissection of a mark, that is, on

only part of a mark." In re Nat'l Data Corp., 753 F.2d 1056, 1058 (Fed.Cir.1985).

Plaintiff argues that the marks are similar because of the similar wordings and the use of all capital, block lettering with an ampersand. (Doc. 38 at 8). Plaintiffs also argue that the marks are "nearly identical" phonetically, further strengthening the similarity of the marks.[13] (Id.). Defendants respond that the marks are not similar because of stylistic differences in the marks, namely Defendants' use of a stylized chimney, door, and roof in its mark; the use of a "significantly different font"; and the additional word "Magazine" included in Defendants' mark. (Doc. 43 at 15).

When considered as a whole, the trademarks "HOMES & LAND" and "HOMES & LOANS MAGAZINE" are of similar appearances and sounds. When taken alone, the use of the common word "homes" and an ampersand in both marks does not render the marks similar, see Freedom Sav. & Loan Ass'n v. Way, 757 F.2d 1176, 1183 (11th Cir. 1985). However, the use of the common word and symbol becomes confusingly similar when the marks' overall impressions are considered. Plaintiff's trademark "HOMES & LAND" is displayed on magazines distributed for free to the general public, just as is Defendants' "HOMES & LOANS MAGAZINE" trademark. Both marks use all capitals and block lettering

_____

[13]In its argument regarding the marks' similarities, Plaintiff offers evidence that "the extremely qualified and studied attorneys for Defendants themselves demonstrated actual confusion between the marks" during witness examinations, referring to various slips of the tongue by the attorneys. (Doc. 38 at 8). Relying on Marshall Field & Co. v. Mrs. Fields Cookies, 25 U.S.P.Q.2d 1321, 1334 (Trademark Tr. & App. Bd.1992), Defendants correctly counter that such slips of the tongue should not be considered as evidence of actual confusion because it is obvious that Defendants' attorneys are aware of the differences between the two entities. (Doc. 43 at 11-12). Because Plaintiff proffers this evidence under the "similarity of the marks" factor, the Court considers such evidence as evidence of the marks' similarities only and does not credit it as evidence of actual confusion.

and create the overall impression of a magazine dedicated to the real estate industry and its related services. Defendants' inclusion of "magazine"—an additional word of lesser importance—does not reduce the danger of potential confusion, especially in light of Plaintiff's use of its marks in the real estate magazine industry. See Frehling, 192 F.3d at 1337. Though Defendants' addition of a stylized chimney, door, and roof in its mark—added only after Plaintiff threatened suit—creates some dissimilarity between the marks, the Court finds that the overall impression created by the trademarks' similarities weigh strongly in favor of Plaintiff's contention that the marks are likely to cause confusion.

### 3. Similarity of Products Represented

"'The greater the similarity between the products and services, the greater the likelihood of confusion.'" John H. Harland Co., 711 F.2d at 976 (quoting Tex. Motor Exch., 628 F.2d at 505). Plaintiff argues that both it and the Defendants provide "a marketing tool for real estate professionals and to buyers and sellers of real estate via their free magazines." (Doc. 38 at 9). Defendants attempt to differentiate their product, stating that their magazines "have distinctively different logos, are of different sizes[,] and use very different textures of paper." (Doc. 43 at 16). The Court, however, finds that the products and services are virtually identical; both are magazines selling advertising space for real estate professionals and related services for distribution to the general public via a free magazine.

### 4. Similarity of Sales Methods

"This factor takes into consideration where, how, and to whom the parties' products are sold." Frehling, 192 F.3d at 1339. While "the parties' outlets and customer bases need

not be identical, . . . some degree of overlap should be present."  Id.

Neither party addresses directly the focus of this factor, namely how the parties sell advertisements in their magazines.  Instead, when addressing this factor, the parties discuss the manner in which they distribute their magazines.  Plaintiff contends that it distributes magazines advertising real estate for sale in all the cities and in many of the same places that Defendants distribute their magazines.  (Doc. 38 at 9).  Additionally, Plaintiff contends that both it and Defendants list real estate for sale using their respective websites.  (Id.).  Defendant Robert Klezmer admits in his deposition that Defendants' magazines are distributed at grocery stores, restaurants, and real estate offices just as Plaintiff's magazine is.  (Ex. 6 to Doc. 38).  However, Defendants attempt to differentiate their distribution methods by arguing that in addition to these locales, they also distribute their magazines in "numerous small shops such as beauty salons, restaurants, and other small vendors, where Plaintiff's magazines are not distributed."  (Doc. 43 at 16).  When determining the likelihood of confusion a court may consider "new factors" as necessary, see Swatch Watch, S.A., 785 F.2d at 958.  The Court finds that the similarity in the distribution outlets for Plaintiff's and Defendants' magazines increases the likelihood of confusion.

The Court now addresses the "similarity of sales methods" factor.  Because the parties distribute free magazines, the only sales conducted were to the real estate professionals who bought advertisements in the magazines.  Plaintiff markets its services to the real estate profession through various direct sales methods, including phone solicitations, emails, hosting in-office sales presentations, providing meals, and distributing leaflets.  (Ex. 2 to Doc. 38, ¶¶ 4, 6).  Defendants market their magazine to potential

advertisers in a nearly identical manner.  (Benton Decl., Attach. to Doc. 43, ¶¶ 4, 9; Baker Decl., Attach. to Doc. 43).  The Court finds an increased likelihood of confusion given the great similarity in the manner in which both parties sell advertisements in their magazines.

### 5.  Similarity of Advertising Methods

"The greater the similarity in advertising campaigns the greater the likelihood of confusion."  <u>Ross Bicycles, Inc. v. Cycles USA, Inc.</u>, 765 F.2d 1502, 1508 (11th Cir. 1985). In support of this factor, Plaintiff argues that both parties use the same media—free magazines and internet web sites—to display advertisements purchased by realtors and related customers.  (Doc. 38 at 10).  Defendants admit that both parties advertise the services to real estate professionals but attempt to differentiate themselves by arguing that they advertise to an additional market of mortgage professionals and lenders.  (Doc. 43 at 17).  Neither party provides the Court with additional evidence not already addressed in the previous factor as to how they advertise their magazine to their target consumers—the real estate professionals who buy advertising space in the magazines.  Therefore, the Court does not find that this factor favors either party.

### 6.  Defendants' Intent

"If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity."  <u>Frehling</u>, 192 F.3d at 1340.  As evidence of Defendants' intent to derive benefit from Plaintiff's mark, Plaintiff argues that prior to choosing "HOMES & LOANS MAGAZINE" as its mark, Defendants knew of the *Homes & Land* magazines and the wide recognition enjoyed by the HOMES & LAND marks.

(Doc. 38 at 10).  Plaintiff then states that Defendants clearly intended to trade upon Plaintiff's goodwill built upon the long and continuous use of the HOMES & LAND marks by deliberately choosing a "name strikingly similar to the mark everyone knows."  (Id.). Defendants admit that they knew of Plaintiff's mark when selecting a name for their magazine.  (Doc. 43 at 17).  "However, 'prior knowledge of a senior user's trade mark does not necessarily give rise to an inference of bad faith and may be consistent with good faith.'" Michael Caruson & Co. v. Estefan Enters., 994 F. Supp. 1454, 1462 (S.D. Fla. 1998) (quoting Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 397 (2d Cir.1995)).

    Notwithstanding their knowledge of Plaintiff's marks, Defendants contend that they acted in good faith by intentionally selecting the name *Homes & Loans Magazine* to reflect the services that they intended to market in their magazine.  (Doc. 43 at 17).  "'Good faith can be found if a defendant has selected a mark which reflects the product's characteristics . . . .'"  Michael Caruson & Co., 994 F. Supp. at 1462 (quoting W.W.W. Pharm. Co. v. Gillette Co., 984 F.2d 567, 575 (2d Cir. 1993)).  Additionally, Defendants argue that their willingness to rework their mark is evidence of their good faith.  (Doc. 43 at 17).  Though the Court does not find Defendants' attempt to redesign their trademark to be any more than an attempt to avoid litigation, Plaintiff has not presented evidence enabling this Court to infer at the summary judgment stage that Defendants adopted Plaintiff's mark with the intent to derive an improper benefit.

### 7.  Actual Confusion

    Proof of actual confusion is not necessary to prove likelihood of confusion, Frehling, 192 F.3d at 1340, but it is "[t]he most persuasive evidence in assessing the likelihood of

confusion," <u>Alliance Metals, Inc.</u>, 222 F.3d at 907. "Actual confusion by a few customers is the best evidence of likelihood of confusion by many customers." <u>Freedom Sav. & Loan Ass'n v. Way</u>, 757 F.2d 1176, 1185 (11th Cir. 1985). Actual confusion may be shown in a variety of ways, including "inquiries regarding possible affiliations between the parties," "attempts to purchase goods or services actually offered by the other party," and "misdirected correspondence such as bills or letters." <u>Popular Bank of Fla. v. Banco Popular De Puerto Rico</u>, 9 F. Supp. 2d 1347, 1360 (S.D. Fla. 1998).

When examining the likelihood of confusion in the marketplace, a court examines only those in the relevant consumer group, not the general public. <u>Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.</u>, 508 F.3d 641, 651-52 (11th Cir. 2007). "A potential customer is one who might some day purchase this kind of product or service and pays attention to brands in that market." 4 J. Thomas McCarthy, <u>McCarthy on Trademarks & Unfair Competition</u> § 23:5, at 23-23 (4th ed. 2008). The relevant consumer group is narrower than the general public; "for example, in a case concerning similar marks used on recreational sailboats, the possible confusion of a person who has no interest in boats at all is not relevant." <u>Id.</u>; <u>see also</u> <u>Estee Lauder, Inc. v. The Gap, Inc.</u>, 108 F.3d 1503, 1511 (2d Cir. 1997) (noting that the test "is whether confusion is probable among numerous customers who are ordinarily prudent"). Generally, when magazines are involved, the "the principal groups of potentially confused consumers are (a) advertisers; (b) subscribers; and (c) newsstand purchasers." <u>Inc. Publ'g Corp. v. Manhattan Magazine, Inc.</u>, 616 F. Supp. 370, 386 (S.D.N.Y. 1985). Here, however, due to the free nature of the parties' publications, the relevant market would be potential advertisers in Plaintiff's magazines, as there are no subscribers or newsstand

purchasers.

In support of its assertion of actual confusion, Plaintiff has submitted five affidavits and one deposition detailing sixteen alleged incidences of actual confusion amongst potential advertisers. However, Plaintiff submits no evidence of actual confusion regarding its service mark. In the first affidavit, Alice Lincoln, an employee of Plaintiff's franchisee, detailed five incidences of actual confusion experienced by Plaintiff's consumers, including: (1) that Lincoln spoke with Thomas Soriero of Realty Executive in Ormond Beach, Florida, who believed that he had placed an ad with Plaintiff when in reality he had placed an ad with Defendants[14] (Lincoln Aff., Ex. J to Compl., ¶ 4); (2) that Lincoln spoke with Anna Lukyanova, who confused the parties during their conversation, (id. ¶ 5); (3) that Lincoln contacted Ms. Althea Thomas of Southern Title in Volusia County, who believed that she had already spoken with Plaintiff about advertising when in reality she had spoken with Defendants, (id. ¶ 6); (4) that Lincoln questioned whether she could leave a flyer and a copy of Plaintiff's magazine at a real estate office in Ormond By The Sea, Florida, but was told that someone had already left a copy of Plaintiff's magazine when in reality someone had left a copy of Defendants' magazine, (id. ¶ 7); and (5) that Lincoln had to clear up some confusion

---

[14]Though courts are divided on whether testimony given by the recipient of the statements of the confused consumer constitutes impermissible hearsay, see Popular Bank, 9 F. Supp. 2d at 1360-61 (providing a detailed analysis of the division in this area and admitting the evidence under Rule 803(3) of the Federal Rules of Evidence, the "state of mind" exception), this Court need not decide this issue because Defendants waived any potential hearsay objections in their response to the motion for summary judgment, (see Doc. 43 at 10 (stating that the evidence is "not barred by the hearsay rule since an inquiry is not an 'assertion'" and instead requesting that the Court give the statements little probative value)).

regarding what company she was with when speaking with a woman named "Tara" at Ideal Real Estate, (id. ¶ 8).

With regard to these five instances, Defendants provide an affidavit refuting only the confusion of Lukyanova. (See Lukyanova Aff., Ex. 6 to Doc. 43 (stating that she suffered no confusion between Plaintiff's and Defendants' marks)). Defendants then argue that Plaintiff did not identify the declarants with enough specificity to enable Defendants to contact the other confused consumers in order to obtain their statements as well. (Doc. 43 at 7). This argument is not persuasive because in nearly every instance complained of Plaintiff provides the first name, last name, and office of the confused person.

Plaintiff next submitts the affidavit of Rebecca Williams, an advertising representative at Plaintiff's Carrollton, Texas office. Williams detailed three incidences of actual confusion, including: (1) receiving an invoice from a local realtor for a lunch attended by Defendants' local representative, (Williams Aff., Ex. 4 to Doc. 38, ¶ 4(a)); (2) receiving a postcard from a local realtor addressed to "Homes & Loans Magazine" but containing Plaintiff's mailing address and thanking Defendants for hosting a breakfast and giving a presentation, (id. ¶ 4(b) & Ex. 1 thereto); and (3) receiving a call from Linda Bennett of The Greater Lewisville Association of Realtors asking if Plaintiff would still honor a prize won at a local event—a free page of advertising in Defendants' magazine—in response to which Williams had to explain that they were separate companies, (id. ¶ 4(d)).

Defendants submit evidence refuting that any actual confusion existed in either the misdirected invoice or the postcard. Defendants have provided the affidavit of Gretchen Ramsey, an employee of the realtor who sent the invoice, stating that she committed a

clerical error when mailing the invoice and that no confusion existed in her mind that two, distinct magazines existed. (Ramsey Aff., Ex. 5 to Doc. 43). Additionally, Defendants submitted the affidavit of Bob Baker, stating that an "alphabetically challenged" staff member committed a clerical error and sent the postcard to the wrong company. (Baker Aff., Ex. 7 to Doc. 43). Defendants provided no evidence to discredit the confusion allegedly suffered by Linda Bennett.

Plaintiff has also provided the affidavit of Donna Latham, an advertising representative in Plaintiff's Carrollton, Texas office, which details two instances of actual confusion, including (1) that Jeannie Young, a realtor in Texas, contacted her requesting that Latham change a price listing in Plaintiff's magazine, when Young had actually placed a listing in Defendants' magazine, (Latham Aff., Ex. 10 to Doc. 38, ¶ 4 & Ex. 1 thereto), and (2) that Latham received a call from Al Palmer, the office manager of Century 21 Garland, confirming an appointment when he really had an appointment with Defendants, (id. ¶ 5).

Defendants have provided affidavits refuting both instances. Young's affidavit states that she was not confused at any time about the two parties, that she has never advertised with Plaintiff, and that her email was a hurried reply to an email notice from Plaintiff that a deadline was looming for advertising in the current issue.[15] (See Young Aff., Ex. 9 to Doc. 43). Palmer's affidavit states that his phone call to Latham was a result of his poor

_____

[15]It is difficult to understand why Young would reply to an email from a company with which she does not do business and seek to change a listing currently placed with a separate company unless some level of confusion existed, even if only momentarily. Had no confusion existed, Young simply would not have replied to the email, even in her hurried state.

handwriting and that because he could not read his notes, he called to verify if he had indeed scheduled an appointment with Plaintiff. (Palmer Aff., Ex. 8 to Doc. 43). However, Palmer stops short of stating in his affidavit that no confusion existed regarding the magazines. (See id.).

Plaintiff's fourth affidavit presents the testimony of Terry Smith, Plaintiff's Legal Services Manager. Smith details four instances of actual confusion, including: (1) that Ken Yarbrough, a licensee of Plaintiff, sponsored a luncheon with WCR group where his sponsorship was listed as being from Defendants' magazine (Smith Aff., Ex. 1 to Doc. 38, ¶ 9(d)); (2) that Lee Livingston, a Dallas-area real estate agent, contacted Plaintiff via email about an advertisement in Defendants' magazine, (id. ¶ 9(e)); (3) that Tani LePage, a Jacksonville realtor, contacted Plaintiff about an advertisement of Defendants, (id. ¶ 9(f)); and (4) that two advertisers informed Plaintiff's Dallas office that they were already advertising with Plaintiff when in fact they were advertising with Defendants, (id. ¶ 9(g)). Defendants provided no evidence to refute this testimony.

Plaintiff's final affidavit is from Martha Lower, an Orlando publisher of Plaintiff's magazine. Lower's affidavit states that she and Alice Lincoln gave a presentation and supplied breakfast to Weichert Realtors of Ormond Beach, Florida. At this presentation, the Weichert Realtors manager prepared a welcome sign that said "Welcome Martha and Alice from Homes & Loans Magazine" (Lower Aff., Ex. 2 to Doc. 38, ¶ 4). Defendants provided no evidence to refute this testimony.

In addition to these affidavits, Plaintiff has also presented the deposition testimony of Defendant William Keeler. Keeler stated that he received a call from a person seeking to

place an ad with his magazine.  (See Doc. 38 at 10-12).  But, after receiving a contract from Keeler, this unidentified person called back to seek clarification as to whether Defendants' publication was actually Plaintiff's magazine.  (Id.).  When Keeler explained that they are in fact two separate companies, the unidentified individual was told to call Lower, Plaintiff's representative in the area.  (Id.).

In response to the foregoing evidence, Defendants argue that Plaintiff is required to prove actual confusion and not likelihood of confusion as required under 15 U.S.C. § 1114. Defendants' argument is based on their contract with Plaintiff in which Plaintiff reserved the right to review its conditional acceptance of Defendants' altered mark should confusion occur.  Defendants take this to mean that Plaintiff must now prove actual confusion in order to prevail on its claims under the Latham Act.  (Id.).  However, § 1114 provides the likelihood to cause confusion standard for claims of infringement, and this is the law that applies to Plaintiff's claim.  Whether Plaintiff needs to prove actual confusion is properly presented in Defendants' counterclaim for breach of contract.

Next, Defendants argue that the testimony of witnesses—particularly witnesses who are competitors of Defendants—about what other witnesses said is of "little probative value since the declarants themselves are not testifying and in most cases it cannot be determined why they asked what they asked or why they said what they said."  (Doc. 43 at 6, 10). Defendants argue that Plaintiff provided no statements of the allegedly confused persons themselves, giving no indication as to why the declarations of confusion were made or in what manner they were induced.  (Id. at 6).  Defendants' argument correctly goes to the weight to be given to the testimony of the recipients of the statements indicating confusion.

Plaintiff's affidavits describing third-party confusion are not entitled to the substantial weight that would be afforded in-court testimony from the confused third party. They are also not entitled to the same weight that would be assigned to affidavit testimony directly from the third parties. Nonetheless, the affidavit testimony provided by Plaintiffs are entitled to some weight, and in this case that weight is not negligible. Plaintiff is correct that no reasonable jury could find that no actual confusion existed among the relevant consumers.

### 8. Conclusion

After analyzing the factors individually, it is now necessary to examine the factors collectively to determine whether a question of fact exists regarding the likelihood of confusion. When considering the seven factors, the Eleventh Circuit has stated that the examination of the seven factors "entails more than the mechanistic summation of the number of factors on each side; it involves an evaluation of the 'overall balance.'" Custom Mfg. & Eng'g, 508 F.3d at 649. "[A] court must also take into account the unique facts of each case." Id. at 650. Additionally, the Custom Manufacturing court noted:

> These factors imply no mathematical precision, but are simply a guide to help determine whether confusion is likely. They are also interrelated in effect. Each case presents its own complex set of circumstances and not all of these factors may be particularly helpful in any given case. . . . The ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.

Id. (quoting Homeowners Group, Inc. v. Home Mktg. Specialists, Inc., 931 F.2d 1100, 1107 (6th Cir.1991)).

Clearly, a likelihood of confusion exists between Plaintiff's trademark and Defendants' use of its similar mark, and no reasonable jury could find otherwise. Defendants have not

refuted multiple instances of actual confusion.  However, the Court cannot find under the standard required for summary judgment that a likelihood of confusion exists regarding Plaintiff's service mark, chiefly because Plaintiff's service mark does not enjoy the same incontestable status as Plaintiff's trademark.  Moreover, Plaintiff failed to present evidence of actual confusion regarding the service mark, leaving a question of fact for a jury's determination as to whether a likelihood of confusion exists with Plaintiff's service mark. Plaintiff's motion for summary judgment is granted regarding liability as to Counts I, III, and IV of Plaintiff's Complaint (Doc.1) and as to Count I of Defendants' Counterclaim (Doc. 13).

> B.  Breach of Contract Counterclaim

In Count IV of Defendants' counterclaim, Defendants allege that Plaintiff breached its contract with Defendants by filing suit for trademark infringement before first reopening discussions with Defendants.  (Doc. 13).  Florida law requires three elements for a breach of contract claim: (1) a valid contract; (2) a material breach; and (3) damages.  Abbott Labs., Inc. v. Gen. Elec. Capital, 765 So. 2d 737, 740 (Fla. 5th DCA 2000).  The parties agree that a valid contract existed, but a dispute exists as to whether Plaintiff committed a material breach of the contract by failing to reopen discussion with Defendants prior to filing suit and what, if any, damages any material breached caused.

The contract at issue arose after Defendants changed their mark in response to Plaintiff's threat of litigation.  The contract states that "[a]lthough [Defendants'] new design is acceptable in its present format, [Plaintiff] reserves the right to reopen these discussions, should this design be changed in the future to be something that approximates that of [Plaintiff's design] or if actual confusion is found to occur."  (Doc. 13, Ex. 5).  Defendants

claim that Plaintiff only reserved "the right to reopen discussions," not the right to file suit if confusion were found to occur. (Doc. 43 at 18). Plaintiff contends that it accepted Defendants' changes to their mark on a conditional basis and that Plaintiff specifically did not promise that it would never assert an infringement claim, did not agree that Defendants' mark was not infringing upon Plaintiff's mark, and did not give Defendants reason to believe that litigation would not result if actual confusion occurred with the use of the new design. (Doc. 38 at 13). Plaintiff argues that instead, the contract simply provides that Plaintiff may terminate its approval of Defendants' new mark if actual confusion occurs, allowing Plaintiff to return to its prior posture of a company on the verge of filing suit.

"Under Florida law, courts must give effect to the plain language of contracts when that language is clear and unambiguous." Arriaga v. Fla. Pac. Farms, L.L.C., 305 F.3d 1228, 1246 (11th Cir. 2002) (citing Hamilton Constr. Co. v. Bd. of Pub. Instruction of Dade County, 65 So. 2d 729, 731 (Fla. 1953)). Here, the only right created by the plain language of the contract gives Plaintiff the right to revoke approval of Defendants' altered mark should actual confusion occur, but nowhere does the contract create an affirmative duty on Plaintiff's part to contact Defendants before filing suit or in any manner abridge Plaintiff's right to bring suit. The Court finds that Defendants do not present the necessary elements for a breach of contract claim, as Plaintiff committed no material breach of the contract. The Court grants Plaintiff's request for summary judgment on Count IV of Defendants' counterclaims.

C. Promissory Estoppel Counterclaim

In Count V of Defendants' counterclaim, Defendants assert a claim for promissory estoppel, alleging that "[Plaintiff] completely changed its position and brought this lawsuit"

against Defendants in violation of the same written agreement between the parties that formed the basis of Defendants' breach of contract counterclaim. (Doc. 13 ¶¶ 41-46). This claim fails. Even assuming that Defendants meant that they changed their position based on Plaintiff's promise,[16] a claim for promissory estoppel is unavailable under Florida law where a written contract exists covering the disputed promise. Advanced Mktg. Sys. Corp. v. ZK Yacht Sales, 830 So. 2d 924, 928 (Fla. 4th DCA 2002) (citing Jhaver v. Zapata Off-Shore Co., 903 F.2d 381, 385 (5th Cir. 1990)). "'Promissory estoppel is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract.'" Id. (quoting Gen. Aviation, Inc. v. Cessna Aircraft Co., 915 F.2d 1038, 1042 (6th Cir.1990)). As Defendants already argued, a written contract existed covering the parties' agreement as to Defendants' use of its altered mark and Plaintiff's rights should actual confusion occur. Accordingly, the doctrine of promissory estoppel is not applicable under these facts, and the Court grants Plaintiff's request for summary judgment on Count V of the Defendant's counterclaims.

D. Copyright Infringement Counterclaim

In Count VI of Defendants' counterclaim, Defendants allege that Plaintiff infringed upon Defendants' copyrighted material when it published an advertisement allegedly copied from Defendants' copyrighted material. (Doc. 13 ¶¶ 47-55). Defendants contend that they

---

[16]Typically, a claim of promissory estoppel requires the party bringing the claim to prove that it changed its position to its detriment in reliance on a promise of another. Here, instead, Defendants assert that Plaintiff changed its position, causing Defendants damages. (Doc. 13 ¶ 45). Regardless, the Court interprets Defendants' clams as stating that their expenditures in promotion of their mark were made to their detriment based upon Plaintiff's promise.

are entitled to actual damages upon a jury finding that Plaintiff profited from the infringing activity. Plaintiff moves for summary judgment, arguing that Defendants have not presented proof of damages caused from the alleged acts of infringement. (Doc. 38 at 20-23).[17] Specifically, Plaintiff contends that Defendants fail to establish a causal connection between Plaintiff's conduct and Defendants' alleged actual damages. Plaintiff also contends that Defendants are barred by statute from seeking either statutory damages or attorneys fees. (Id.).

Sections 504 and 505 of Title 17, United States Code, set forth the damages available to a successful complainant in a copyright infringement action. 17 U.S.C. §§ 504-505. Though it remains unclear whether Defendants seek actual or statutory damages under § 504, the record establishes that Defendants are barred from seeking statutory damages and attorney's fees under §§ 504 & 505. Pursuant to 17 U.S.C. § 412, awards of statutory damages and attorney's fees are unavailable to the copyright owner if the infringing activity began after publication of the work but before registration unless registration is made within three months after first publication of the disputed material. See § 412(2). Defendants first published the copyrighted material on May 4, 2007, but did not register the copyrighted material until September 10, 2007—more than three months after its initial publication. (Doc. 13 ¶¶ 50, 53). Plaintiff began the purported infringing activity on July 6, 2007, after first publication but before registration. (Id. ¶ 53). Accordingly, § 412 operates to foreclose

---

[17]In its motion for summary judgment, Plaintiff does not address the merits of Defendants' copyright infringement claim, instead relying as grounds for summary judgment on the proposition that Defendants have not presented evidence to support their claim for damages. (Doc. 38 at 20-23).

Defendants' pursuit of either statutory damages or attorney's fees, leaving only actual damages.

Under § 504(b), the copyright owner may seek actual damages caused by the infringing activity and the profits of the infringing party attributable to the infringing activity. See 17 U.S.C. § 504(b). Though Defendants have not demonstrated how they intend to prove their actual damages,[18] the parties have stated in their Joint Pretrial Statement (Doc. 63) that Defendants intend to prove Plaintiff's profits from its infringing activity through Plaintiff's revenue information, a form of damages specifically permitted by statute. (Id. at 17). Under the statute, Plaintiff would then present evidence of deductible expenses and profits attributable to other factors than its infringing activity. 17 U.S.C. § 504(b).

Because Defendants are not required to prove the amount of their actual damages at this stage, summary judgment would be improper. Accordingly, Plaintiff's request for summary judgment as to Count VI of Defendants' counterclaim is denied.

E. Unfair Competition Counterclaim

In Count III, Defendants assert a counterclaim for unfair competition under Florida common law, alleging that Plaintiff intentionally created confusion by copying Defendants' advertising format and publishing it in Plaintiff's magazines. (Doc. 13 ¶¶ 19, 31-35). Plaintiff

---

[18]In order to collect actual damages, a copyright claimant must demonstrate a causal connection between the infringing party's activity and any injury to the market value of the copyrighted work. Montgomery v. Noga, 168 F.3d 1282, 1294 (11th Cir. 1999). Even if Defendants manage to demonstrate this required causal connection, Defendants, through the deposition testimony of Homes & Loans Magazine's corporate representative, seemingly limited their actual damages from their copyright infringement claim to $150,000. (Keeler Dep., Tab 9 to Doc. 38, at 115:6-18) (attributing $150,000 of $3,500,000 in claimed damages to copyright infringement).

moves for summary judgment without arguing the merits of the claim, instead arguing that Defendants "place copyright infringement and unfair competition blame on a number of Homes & Land franchisees" and that "Defendants have no evidence to support a claim that franchisees were acting on behalf of Homes & Land." (Doc. 38 at 23). However, in Defendants' counterclaim, Defendants assert that Plaintiff itself has participated in the unfair competition by "copying Homes & Loans Magazine's advertising format and publishing it in their magazine." (Doc. 13 ¶ 19). Defendants cite the deposition testimony of Terry Smith, Plaintiff's Legal Services Manager, wherein Smith testified that "Homes & Land [m]agazine is published by [Plaintiff]." (Smith Dep., Ex. 13 to Doc. 43). Defendants present an issue of fact for a jury's determination regarding Plaintiff's participation in the alleged unfair competition, and therefore summary judgment would be improper. Accordingly, summary judgment for Plaintiff on Count III of Defendants' counterclaim is denied.

## V. Conclusion

In accordance with the foregoing discussion, it is hereby **ORDERED** that Plaintiff's motion for partial summary judgment (Doc. 38) is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** regarding liability as to Counts I, III, and IV of Plaintiff's Complaint (Doc. 1) and as to Counts I, IV, and V of Defendants' Counterclaim (Doc. 13). The motion is **DENIED** as to Count II of Plaintiff's Complaint (Doc. 1) and as to Counts II,

III, and VI of Defendants' Counterclaim (Doc. 13).

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 4th day of February, 2009.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record and Unrepresented Parties